UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY ROOVERS,

    Plaintiff,

v.                                                                          Case No. 14-C-370

CAROLYN COLVIN,

    Defendant.

**DECISION AND ORDER**

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying his disability benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

At the time of the hearing, Plaintiff was 64 years old and, at some 225 pounds, was considered obese for his five-foot-eight frame. Prior to the alleged onset of disability, Plaintiff had a long career working in maintenance at a paper mill and a more recent history of driving a truck. His medical history detailed a number of conditions, including back pain, heart troubles, kidney disease, sleep apnea, asthma, anxiety, and diabetes. Many of these conditions were not chronic but required medical treatment only on an *ad hoc* basis. For example, Plaintiff's brief details his visits to physicians and a chiropractor for back pain in 2007, but most of the problems resolved and his doctor released him to work with no restrictions the same year, (R. 244), although he did continue to seek chiropractic treatment on occasion. (R. 250.) Similarly, although he had suffered a heart

attack in the past, a stress echocardiogram revealed no abnormalities (R. 482), and he does not allege significant limitations stemming from the heart attack (apart from what one might normally expect).

His more chronic conditions included asthma, diabetes, sleep apnea and anxiety. Plaintiff's blood sugar and A1C levels fluctuated over the last several years, apparently a result of his non-compliance with lifestyle issues such as diet and exercise (R. 432, 541), and noncompliance with a medication regime, due to Plaintiff's fear of needles. (R. 541, 489, 432.) According to the Plaintiff, his asthma made him cough at night, which prevented the use of a CPAP machine to treat his sleep apnea. (R. 551.) His medical records list Xanax, an anxiety drug, as among his medications, but there is no record of specific mental health treatment except on an *ad hoc* basis. (At the hearing, counsel explicitly stated that "this is not a mental health case." (R. 62.)) As for his asthma, it was not formally diagnosed until recently and involved sporadic episodes of shortness of breath, as well as coughing. (R. 432.)

At his hearing, Plaintiff testified that pain in his back, hip and knees, as well as his asthma, diabetes and anxiety prevented him from working. He stated that his asthma caused him to experience anxiety, as he feared getting an attack. (R. 57.) He also testified that he had trouble reaching over his head, grasping things with his hands, lifting more than ten pounds, and he believed taking 26 pills a day caused his joints to hurt. According to the Plaintiff, he could sit for two and one-half hours in an eight-hour day and could stand or walk for one hour. (R. 58.)

After the hearing, the ALJ denied the claim for disability benefits. The ALJ noted that Plaintiff's heart examinations were essentially normal, with no complications or limitations resulting from the prior heart attack. (R. 15.) Blood pressure was within normal ranges. His diabetes,

2

although not very well controlled, did not result in significant complications nor limitations to Plaintiff's ability to work. Although diabetes resulted in retinopathy (damage to the retina's blood vessels), there was no indication that Plaintiff's eyesight was impacted in any significant way, and Plaintiff testified that he was able to read the newspaper and watch television on a daily basis. The ALJ also noted that although the Plaintiff did report back pain at various times in the record, these were acute incidents (e.g., pain after lifting a toilet), and the pain always resolved eventually. Other aches and pains, such as shoulder pain and a biceps strain, were of a similarly transient nature. As for the sleep apnea, the ALJ observed that the Plaintiff did not use his CPAP machine and cited treatment notes indicating that the apnea was not severe to begin with. Finally, the ALJ found that although Plaintiff had been diagnosed with asthma, "repeated spirometry studies suggest no more than a mild restrictive ventilator defect." (R. 16.) After summarizing all of the Plaintiff's various physical medical conditions, the ALJ remarked, "[i]n point of fact, the medical evidence fails to suggest any very profound physical limitations . . ." (R. 16.) Even so, the ALJ acknowledged that the state agency physicians restricted Plaintiff to medium work in light of the above-cited conditions, and thus the ALJ found the conditions to be severe impairments at Step 3. As for the Plaintiff's mental health conditions, the ALJ acknowledged the allegations of anxiety and depression but noted that Plaintiff had no formal mental health treatment, "and, when offered medication for anxiety, he has declined." (R. 16.) Both state agency physicians found that Plaintiff suffered no severe mental impairments, and the ALJ concluded that Plaintiff's condition was not severe.

At Step 5, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform medium work, with restrictions imposed on overhead lifting and exposure to airborne irritants. The ALJ cited a few key facts in rejecting the claim for disability benefits. First, the ALJ

3

noted that the fact that Plaintiff had attempted to lift a heavy toilet indicated that he did not suffer from disabling physical symptoms. Since Plaintiff had claimed he could only lift ten pounds—a very substantial limitation—the effort to lift something that could weigh up to 100 pounds was "highly contradictory to his allegations." (R. 18.) The ALJ further concluded that "[f]rankly, the claimant has largely failed to achieve the first step in the two-step [RFC] process," that is, that he had an underlying medical impairment that could reasonably be expected to produce the claimed symptoms. The ALJ noted that the "[s]igns, symptoms, and physical findings have been fairly benign in nature and do not document significant musculoskeletal problems, frequent asthmatic attacks, or any very significant complications of diabetes." (R. 18.) Thus, the ALJ concluded that the Plaintiff failed the most basic RFC step—showing that he had an underlying condition that could produce the limitations Plaintiff described in his testimony.

As for the second step, which involves an assessment of how limiting the symptoms are to the Plaintiff's functioning, the ALJ found that there were no treating source opinions opining about Plaintiff's alleged disability. In fact, the only medical source opinion was Dr. Greene's assessment in 2007 that Plaintiff could return to work with no restrictions. In sum, all of the medical records (treating source and state agency physicians) indicated an ability to work, and so the ALJ discounted Plaintiff's testimony and subjective allegations to the contrary. (R. 19.)

**II. Analysis**

**A. Credibility**

The centerpiece of Plaintiff's appeal is his claim that the ALJ failed to evaluate his credibility properly. ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir.

4

2012). Therefore, a court will overturn an ALJ's credibility determination only if it is patently wrong, which means that the decision lacks any explanation or support. *Elder v. Astrue,* 529 F.3d 408, 413–14 (7th Cir. 2008). In drawing conclusions, the ALJ must "explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue,* 641 F.3d 884, 890 (7th Cir. 2011).

The ALJ found Plaintiff's testimony less than fully credible for a number of reasons. Most clearly, as set forth above, the ALJ simply could not identify an underlying medical condition that would produce the kinds of symptoms the Plaintiff was alleging. This necessarily undercut the claimant's credibility. In addition, the ALJ cited the fact that Plaintiff attempted to lift a toilet, which contradicted his claim that he could only lift a gallon of milk. The ALJ also cited the fact that Plaintiff had applied for unemployment benefits, and such an application requires the claimant to represent himself as able to work. (R. 18.)

**1. Medical Evidence**

Plaintiff argues briefly that the ALJ was wrong in finding that Plaintiff's complaints were not supported by the medical record. For support, he notes various tests and x-rays showing various spinal problems and other issues with his joints. But none of these would significantly explain why he was disabled at the time of the alleged onset date. For example, he cites an MRI taken *before* microdiscectomy surgery, which did indicate structural problems and tenderness in the lumbar spine. (R. 240-42.) After the surgery, however, he was "progressing well" and stated he was walking a quarter-mile per day. (R. 238.) Two months later, he was "85% better" and physical therapy and chiropractic were helping him with his remaining symptoms. His spinal surgeon again indicated

5

that he was "progressing well" and "is to return to work with no restrictions on 6/18/07." (R. 230.) Thus, it is unclear why the Plaintiff believes the ALJ should have cherry-picked a pre-operation medical record to support Plaintiff *post*-surgical claim for disability benefits. If anything, the full picture gleaned from the spine surgery records suggests the Plaintiff *was* able to work, which the ALJ noted in citing Dr. Greene's release to work with no restrictions. As for the diabetes, there is no doubt that Plaintiff was diagnosed with diabetes and struggled to get his blood sugar levels down. But almost ten percent of the population suffers from diabetes, a condition, like hypertension, that often does not cause significant limitations despite being dangerous to one's health.[1] Plaintiff never explained why his diabetes, even if uncontrolled, limited his ability to work.

This is not a case where the symptoms alleged rely primarily on subjective self-reported symptoms, as is the case with migraine headaches, depression, and the like. In those kinds of cases, the absence of objective medical evidence would not necessarily be persuasive on the question of credibility. But in a case based on allegations of back and joint pain, sleep apnea, and other demonstrable medical conditions, one would expect more in the way of objective evidence to support the claimant's alleged limitations. Here, no physician opined that the claimant was unable to work, and no such limitation arises from an independent reading of the medical records. *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) ("the discrepancy between the minimal impairment expected from her conditions and her testimony of debilitating pain casts doubt on her credibility.")

**2. Unemployment Benefits**

The ALJ also found troubling the fact that the Plaintiff had applied for unemployment

---

[1] (http://www.cdc.gov/diabetes/pubs/statsreport14/national-diabetes-report-web.pdf, last visited January 29, 2015.)

benefits. During the hearing, the ALJ indicated that he took a "pretty strong view" of unemployment filings because to qualify for unemployment, the individual must certify that he is seeking full-time work and able to do it. (R. 49.) In fact, the ALJ used the word "strong" at least five times to describe his feelings on the issue and the weight he gave to the evidence of an unemployment application. (R. 49-50.) These concerns were reflected more than once in the ALJ's written opinion as well. (R. 14, 18.)

Plaintiff acknowledges that ALJs may properly consider a claimant's application for unemployment benefits as a factor, albeit not a controlling factor. He argues, however, that in this case there was really no inconsistency between the unemployment application and the disability application because, given his age of 60-plus, he could be found "disabled" even if he could perform light and sedentary work.[2] Thus, it is conceivable that at the time Plaintiff applied for unemployment benefits, he was ready and able to perform only light or sedentary jobs, which would mean he could still be found "disabled" thanks to the regulations. If that scenario were true then it would not contradict his application for disability benefits. In short, because someone Plaintiff's age could be both disabled for Social Security purposes *and* capable of engaging in light work for unemployment purposes, the application for unemployment should not have been used as a strike against the Plaintiff's credibility.

It is certainly conceivable that, in a legal sense, there would be no contradiction between claiming one can perform sedentary or light work and (if one is 60-plus) also seeking disability

---

[2] 20 CFR § 404.1568(d)(4) provides: "If you are closely approaching retirement age (age 60 or older) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry."

7

benefits. But here, when given the opportunity to address the issue after the ALJ highlighted the discrepancy, the Plaintiff did not attempt to explain why there *was* no contradiction. Plaintiff's counsel noted that there might not be a contradiction if Plaintiff were ultimately limited to sedentary work (R. 49, 83), but Plaintiff never testified about the nature of the work he believed he was capable of (or that he actually applied for) when he sought unemployment benefits. Indeed, his testimony, if believed, would suggest he was incapable of any level of work. The simple fact that there might, theoretically, be no contradiction does not mean it was error for the ALJ to cite the issue as a factor in the credibility analysis. On its face, there *is* a contradiction between claiming one is able to work and claiming one is *un*able to work, and if there is an exception to that apparent contradiction it seems incumbent on the claimant to make that exception clear, as opposed to simply relying on the fact that, in the abstract, exceptions do exist. Even now, in the extensive briefing on the subject, Plaintiff does not argue anything more than the fact that, in theory, there might not be a contradiction.

Just as important, the argument misses the mark because what's at issue is a layman's credibility, which is based on factual truths rather than *ex post facto* interpretations of regulations. As the ALJ repeatedly pointed out, the issue is very simple: the claimant certified to the unemployment agency, at a fixed date and time, that he was able to work. The claimant, at that point, had absolutely no understanding of the complex Social Security regulations that are being discussed here, and no idea that because of his age and 20 CFR § 404.1568(d)(4), there might be some way to square his statement to the unemployment agency with a disability claim. He was simply saying he was able to work, just as his own physician said he was able to work. It is a concrete record of an objective, factual nature, that does not depend for its truth or falsity on a *future*

8

finding about Plaintiff's RFC. These are matters of fact within the record, and the ALJ is entitled to account for them.

Plaintiff's counsel, the ALJ, and this Court all understand that, in a legal sense, there is indeed a way to rectify the apparent inconsistency, a way to say that X is not X. Although that is something that lawyers can understand, what's at issue is the credibility of the *claimant*, and thus the issue is what the claimant meant, at the time he filed for unemployment, when he told the unemployment agency, "I am able to work." There is no argument, of course, that the claimant *himself* understood that his claim of being able to work might actually be consistent with a disability application, and so the argument pressed by counsel is irrelevant to the issue of the claimant's credibility. Instead, the claimant made a statement that anyone other than Social Security experts would understand to be inconsistent with an inability to work. As the ALJ pointed out, that's all that matters. The ALJ did not err in citing that fact, particularly since he noted it was not outcome-determinative.

**3. The Toilet**

Plaintiff also criticizes the ALJ for speculating that the Plaintiff had been performing maintenance on ten apartment units Plaintiff owned with his wife. The medical records are clear that Plaintiff hurt his back while "picking up a toilet to change the wax ring." (R. 248.) As set forth above, the ALJ made much of this fact, finding it inconsistent with Plaintiff's testimony that he could only lift a gallon of milk. The ALJ also noted, however, that "it is possible he has been performing maintenance work upon any properties he owns." (R. 18). Plaintiff argues this is pure speculation and amounts to reversible error.

It is unclear why the ALJ made the remark just quoted above, but all he said was that it is

9

"possible" that Plaintiff was working on his apartments. This is not a material observation. It is more than clear from the ALJ's opinion that the claimant's credibility was affected not by working on his apartments but by trying to lift an obviously heavy object such as a toilet. It is reasonable to conclude that someone who can barely lift a gallon of milk with one hand, and who alleges significantly limiting back problems, would not attempt to lift a toilet, which is not just heavy but unwieldy, given its size and location on the floor. Plaintiff argues that the fact he hurt himself lifting the toilet is evidence in his favor, but it is not; what's important is that the claimant apparently *thought* he would be able to lift such a heavy object. As a general principle, people who believe a gallon of milk is their limit, and who allege problems grasping things, do not go around trying to pick up toilets. Whether the record is a "smoking gun" is debatable, but surely it is a significant piece of evidence that would lead a reasonable reviewer to question the claimant's testimony. The ALJ did not err in citing the issue as part of his credibility finding.

Plaintiff's argument on this issue, like his argument about his application for unemployment compensation, betrays a misunderstanding of the ALJ's obligation in making a credibility determination. The ALJ is not required to cite conclusive evidence that a claimant is exaggerating his symptoms or lying in order to find his testimony insufficient to support his claim. Seldom, if ever, is conclusive evidence available in social security disability cases, or any other kind of case for that matter. Not many claimants, for example, describe daily activities that would be impossible to perform if they were truly disabled, and the Social Security Administration does not pay investigators to follow claimants around and see if they are really as functionally limited as they claim. Thus, instead of requiring conclusive evidence that a claimant is not telling the truth, the ALJ need only provide reasons based on the record as a whole why the claimant's testimony was not

fully credited. The reasons provided by the ALJ must of course be logical, but they need not rule out any possibility that the claimant is truthful. Even in criminal cases where the burden of proof is beyond a reasonable doubt, conclusive evidence is not required to sustain the verdict.

**4. SSR 96-7p Factors**

Finally, Plaintiff argues the ALJ erred by not considering the factors set forth in SSR 96-7p, 20 C.F.R. § 404.1529(c)(3). These include the claimant's daily activities, the nature of the pain, medication, and treatment. Instead of considering these factors, Plaintiff alleges the ALJ merely relied on the toilet-lifting incident to discount the Plaintiff's credibility and limitations. Plaintiff argues that the ALJ should have credited Plaintiff's claims that he could not crouch or bend over, and that his numerous medications caused side-effects, such as joint pain.[3]

Section 404.1529(a) indicates that "[i]n determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." It seems clear enough from the ALJ's opinion that he did not view Plaintiff's symptoms as "consistent with the objective medical evidence." The ALJ found that the Plaintiff failed to show that he had any underlying condition that could reasonably be expected to produce the alleged symptoms. His "[s]igns, symptoms, and physical findings have been fairly benign in nature and do not document significant musculoskeletal problems, frequent asthmatic attacks, or any very significant complications of diabetes." (R. 18.)

---

[3]Part of the daily pill regime included things like Omega 3 supplements, multivitamins, vitamin C, aspirin, etc. Moreover, the ALJ did address the alleged side-effects of Plaintiff's medications, noting that notwithstanding "at least one treatment note" suggesting that "any joint pain may be just be attributed to side effects of medications," the state agency physicians concluded that he could perform a limited range of medium work. (R. 16.)

11

Similarly, § 404.1529(c) (on which Plaintiff relies) only applies "[w]hen the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain." Once that has been established, "we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work." *Id.* Here, once again, the ALJ concluded that the Plaintiff had failed that most basic step of the analysis. Accordingly, the ALJ was not required to consider all of the Plaintiff's daily activities, etc., as set forth in § 404.1529(c).

Even if he were required to consider all of the factors in § 404.1529(c), it is clear that the ALJ's credibility determination was sound. In essence, the adverse credibility finding was the product of: (1) the complete absence of treating source support; (2) his own physician's release to work with no restrictions; (3) the opinions of *all* of the state agency reviewing physicians and psychologists; (4) the toilet-lifting incident; and (5) the absence of objective or other evidence of an underlying medical condition. Given all of these factors, it would be difficult for any ALJ to simply take a claimant's word for the fact that he was disabled. Here, the ALJ hung his hat on the toilet-lifting incident, and with no other objective evidence supporting the claimant's testimony, there was little reason to credit it. *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000) ("the discrepancy between the minimal impairment expected from her conditions and her testimony of debilitating pain casts doubt on her credibility.")

**B. Residual Functional Capacity**

Plaintiff also argues that the ALJ erred by not including all of Plaintiff's limitations in the residual functional capacity assessment. For example, the ALJ did not discuss Plaintiff's obesity and how it might contribute to his limitations, and he did not properly account for Plaintiff's asthma.

12

Plaintiff cites a recent case in which the Seventh Circuit criticized an ALJ for not accounting for the claimant's morbid obesity, which is a body-mass index (BMI) over 40. There, the Plaintiff had degenerative disk disease, a narrowed spinal canal, "serious spinal problems" revealed by an MRI, and pain and numbness in her legs, and based on all of this the court found it self-evident that morbid obesity would aggravate those kinds of symptoms and conditions. *Goins v. Colvin,* 764 F.3d 677, 681 (7th Cir. 2014). Here, by contrast, the claimant was not morbidly obese and lacked any clear medically determinable conditions. As the Seventh Circuit has recognized, a BMI of about 34 is "not extreme" but only "class 1, the lowest class." *Johnson v. Barnhart,* 449 F.3d 804, 807 (7th Cir. 2006).

In *Hisle v. Astrue,* the Seventh Circuit recognized that it "has repeatedly excused the harmless error of an ALJ who fails to explicitly address a claimant's obesity but arrives at a final decision after reviewing the medical opinions of physicians familiar with the claimant's obesity." 258 Fed.Appx. 33, 37, 2007 WL 4439843, *4 (7th Cir. 2007). For example, in *Pepper v. Colvin,* 712 F.3d 351 (7th Cir. 2013), the Seventh Circuit explained that a failure to discuss obesity does not require reversal when the obesity is already accounted for in the claimant's limitations and other conditions. There, the claimant had high cholesterol, uncontrolled blood sugar, and other conditions that were aggravated by her obesity. Because the obesity was already factored into the analysis by the claimant's own physicians, it was not necessary for the ALJ to discuss the obesity specifically. 712 F.3d at 365. Here, Plaintiff's own spine surgeon released him to work with no restrictions, and obviously Plaintiff's obesity was known to the individual who operated on him. If no restrictions were required by the Plaintiff's own physician following major surgery, it is difficult to conclude that the ALJ's analysis should have been more probing. The obesity was also known to the state

13

agency reviewing physicians, neither of whom believed it imposed a significant additional limitation. *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) (noting that "the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.") Plaintiff's physicians always noted his weight, and obesity was occasionally discussed in their treatment notes. (R. 256, 259.) The state agency physicians, who reviewed the medical record and presumably considered his obesity as well, did not impose any significant limitations. *Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006) ("No medical opinion in the record identified Prochaska's obesity as significantly aggravating her back injury or contributing to her physical limitations. She also fails to point to any other evidence suggesting that her obesity exacerbated her physical impairments."); *Castile v. Astrue,* 617 F.3d 923, 928 (7th Cir. 2010) ("in considering the constellation of Castile's impairments, the ALJ found that 'no treating physician has submitted an opinion that the claimant is incapable of working [due to obesity].'")

Finally, the Plaintiff never explained why his obesity would have needed specific consideration in addition to the role it played in his limitations. *Id.* ("Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk.") For these reasons, the ALJ's failure to consider obesity as an independent factor aggravating his symptoms was not reversible error.

Plaintiff also argues that the ALJ failed to account for Plaintiff's asthma because the ALJ imposed a limitation of avoiding exposure to pulmonary irritants. Plaintiff argues that he avoided going outside during cold weather because that exacerbated his asthma, but the ALJ's limitation

14

does not account for this. Since none of Plaintiff's physicians limited his exposure to cold and the ALJ found him less than fully credible, no such limitation was required. Even so, the jobs the ALJ found the Plaintiff capable of doing (e.g., sandwich maker) do not involve exposure to cold weather conditions, and so it is difficult to see why such a limitation would be material.

In addition, Plaintiff argues the ALJ erred by not considering how his sleep apnea would have affected his ability to work. He asserts that he needs naps during the day, and that fatigue would impact his ability to work. But this is after-the-fact argument. At the hearing, he testified that he did not have any trouble focusing or concentrating on things. (R. 62.) He testified that a typical day involved watching TV, reading and letting his dog outside, without mentioning fatigue or any need for naps. (R. 66-67.) In one medical record, he told his doctor that he napped during the day, but there is no indication that sleep apnea was the cause of his napping or that he was so fatigued that a nap was *required*. (R. 553.) Given his own testimony about his daily activities, and the absence of any testimony regarding fatigue, there is no reason to believe that his sleep apnea materially impacted his ability to work. And even if it did, his unwillingness to use a CPAP machine or other treatment is not rendered clear from the record. ("He tried AutoPAP for a brief period, but did not like it.") (R. 553.)

Finally, the Plaintiff argues the ALJ failed to explain in a function-by-function analysis why Plaintiff was capable of medium work. He states that there is no explanation for the ALJ's conclusion that Plaintiff had the ability to stand and walk for six hours in an eight-hour day in light of his hip and knee pain.

But this argument relies primarily on Plaintiff's own credibility, which was duly discounted by the ALJ. The fact that the claimant testified he had certain limitations, which were unsupported

15

in the record, does not mean the ALJ must credit them in determining what kind of work the claimant can perform. Moreover, the state agency physicians concluded Plaintiff could lift 50 pounds and could walk or stand for six hours in a day. (R. 347, 381.) There is thus no mystery as to how the ALJ concluded that the claimant could perform medium work.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this 26th day of January, 2015.

    /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court